Good morning, Your Honors. It's been 40-some years since I had the honor of appearing before this Court, and it's a pleasure to be back here again. Pleasure to have you. Your Honor, I submit we have perhaps the most interesting case on the docket this morning, as interested as we are in hospital reimbursement. This is an equity case. It arises because my client spent some $17 million restoring the second tallest building in Sioux City, Iowa, a historic Art Deco building known as the Badger O. Jackson Building, investing more than $10 million of their own money. It was a tax credit investment, and it was in federal and state tax credits to defer the cost of the restoration. Counsel, I have a question. What is the present status of the Badger O. building? The Badger O. building has been completely restored. It is ready to be rented. The bank will, and the trustee, and the receiver, rather, will not let us rent it, although we have produced tenants. So there can't be any tax credit money received, or if it is... Where it stands now is that the building was completed, the restoration was completed over the summer. The federal tax credits were applied for in August and were certified by the National Park Service in September. And some $3.5 million in federal tax credits have now been credited against the bank's debt. And we maintain there's another half a million that's available as soon as we can get the records together. I'm sorry to interrupt you. No, no, that's fine. You need to know that, because what that leaves, then, is a balance owed to the bank of approximately $2 million. Significance of this is that the bank has scheduled a foreclosure sale of that property eight days from now on the 22nd of November. And as part of this, I wish to renew my request that this court grant a stay to allow this court time to decide the issues in this case. But you don't offer to post a bond, right, still? We can't post a bond because we have no answer. You said you cannot post a bond, right? All of our assets are held by the receiver, so we cannot post a bond. Thank you. And we don't think a bond is necessary because the building is worth $10 million. I mean, we spent 17, now $18 million restoring it, and the bank over the past year has spent another $2 million. So there is substantial equity in that property. And from the rents that we have received, we had some tenants in there short time, and the tenant we offered, the building, if fully rented, would yield some $2 million a year in free cash. There is no danger here that the bank is not going to be paid. That's not why we're here. We're here because the bank wants the building. They want the building for free, and that's why we're here. And why we're really here is that instead of hearing our motion to disqualify the law firm that represents the bank, Judge Strand denied our motion to hear that first and, in fact, forced us to trial. And we had a trial of the motion to appoint a receiver and a trial at the same time on motion to disqualify the Winthrop law firm. And Mr. Rosso here represented the bank against us, and his partner, Mr. Norman Jones, was the principal witness against my client. So once we have the hearing, my client is forced to face his own lawyer across the courtroom, not only as an adversary lawyer, but as the chief witness against him. Did you waive that, though? No, we did not waive that. Are you sure? Look at the letter of May 7, 2013. Tell me how you didn't waive it there. May 7, 2013. Yeah, you know the letter. It's the letter in this case on Winthrop stationery. Absolutely. And if you look at the language of that letter, it comes down to what does the word or mean? What is or, or? And if you look at the most generous, or is ambiguous. What does it mean? It could mean either one. It could mean both. But if you look at the language of the letter. Doesn't it usually mean one or the other? That would be the first, that would be the first standard meaning, but it can also mean both. But if you look at the letter as a whole, what the letter says. Saying I'm going out to dinner with you or him, I think it means you're going with one or the other of them. Tell me why I'm wrong. I don't want to go with either him or her. It means I'm not going to go with either one. It could mean, it could mean either way. But if you look at, if you look at the letter as a whole, what the letter says to my client is, if Winthrop starts to represent the bank in litigation against you, you can ask that they withdraw. You can object that there's a conflict. And then the letter says they shall withdraw. Because my client, before he signed that letter, wrote them and said, you have to change may withdraw to shall withdraw because that will give me the comfort that I need. What comfort could he possibly have in mind except the comfort that he wouldn't be sued by his own lawyer? So when you look at the letter as a whole, you look at the parole evidence, it's clear that that was the intent of the letter. That if a conflict or a dispute or litigation arose, my client could object and Winthrop would be required to withdraw. Now, that's substantiated by the fact that when Winthrop did initiate this foreclosure, the first thing that my client did was write to Norman Jones, the partner who had written the letter and who he'd been dealing with candidly all along. He never was told that Winthrop did not represent him. The first indication he had that Winthrop didn't represent him was when they filed this lawsuit. Because he was working cooperatively with them. I thought there was a break in time that the attorney didn't deal with the client. Is that true or false? Well, their position is that they didn't actually represent my client. I mean, no communications, no billing, you know what dealing with a lawyer is. Is a period of time they really didn't deal with a lawyer? No. Okay. Every day, huh? No, no. Go ahead. Winthrop did not bill my client after the loan closed. They billed my client for all the work they did for the bank on the closing. He paid for all of that. After that, Winthrop continued to be involved in the transaction because the loan had to be extended several times. And my client was dealing with Winthrop with the belief that Winthrop was not going to, what shall I say, a double deal. And in fact, in November of last year, this is in Mr. DeVolt's affidavit, he said, in November of 2017, Norm Jones came to him and said, hey, look, let's get together and let's kick Chevron out of this deal and put the bank in. And we'll go down the road together on this and get this taken care of. My client waited for them to make an offer. They never made an offer. The loan went into fault in December. And in April, they filed for receivership. We submit that a lawyer can't sue his own client. There's no question but what? Winthrop was my client's lawyer. Now, Winthrop says, oh, no, we didn't represent you for five years. So then it's olly olly, uncle. There's no such rule. There's no five-year rule. Once a client, always a client, when it's on the same transaction. There's a lot of truth to that, obviously. And if there's not a waiver, that's the absolute truth. The question really becomes, what if the judge got the disqualification part of it right? How does that render the rest of the action in error? Well, I think the Bowers case addresses that directly, where you had a situation where there was a disqualification of the law firm. And the district court went ahead and granted a summary judgment. And the Sixth Circuit said, flat out, you can't do that, because nobody can predict what would happen. Once the lawyer violates the sacred bond of attorney-client privilege, you don't know what's going to happen. You can't predict it. You have to absolutely prevent that. And the fact that Judge Strand went ahead and went straight to the merits without ruling on the disqualification is error. And plus, he applied the wrong standard. He says, my client has to prove that there was a conflict of interest. No, no. That's not the rule. Under the Dean Foods case here, and under the Davenport case, this circuit clearly says, once you establish the attorney-client relationship, there is an irrefutable presumption that confidential information is used and that it has to be disqualified. The law firm has to be disqualified. The burden is on the law firm, not on the client. Let me address a procedural question here, too, that I don't think is emphasized sufficiently in the pleadings. Once the receiver was appointed, all of the right title and interest of my clients was given to the receiver. I had no standing at that point to participate in that litigation. I had no money. It was all, the receiver had all the money. Did you try to intervene because you said no standing? Sounds to me like you tried to intervene. You didn't try to intervene, right? No, I did not try to intervene. So you don't know what a court would have said about your standing, right? No, I don't. Well, I do know because Judge Strand's order says that if we in any way interfere with what the receiver is doing, we might well be held in contempt. He'd already ruled on it. We had to stay out of the way. And he also, we had no money. So basically, we were in a situation where we had no standing, no money, no records, and our own lawyer was suing us. We bring this appeal. We had to wait until after there was a final, appealable order, and that's why we're here. And I will reserve the balance of my time. Thank you, sir. Thank you. Mr. Russell? Thank you, Mr. Court. My name is Michael Rosso, and along with Thomas Boyd, I represent Cedar Rapids Bank and Trust, who I'll refer to as CRBT. The district court's order for judgment should be affirmed for three reasons. First, the appellants defaulted by failing to answer the complaint, failed to respond to the motion for summary judgment. Appellants had a full and fair opportunity to participate and respond on the merits of this case, but they chose not to. Instead, they chose to default and ignore a motion for summary judgment. On that basis alone, CRBT was entitled to the entry of judgment in its favor, and this court can affirm on that basis. Second, even though the district court would have been well within its rights and the case law to grant default judgment, it chose not to. Instead, it chose to delve into the record and evaluate whether CRBT had met its obligations to present admissible evidence on all of the elements necessary to establish its claims. Determining that CRBT had done so, the district court entered summary judgment. Third, this court can affirm because Winthrop and Weinstein does not have a disqualifying conflict. The waiver letter, the passage of time, both preclude this court's from coming to a conclusion that the district court erred in ruling that there was no disqualifying conflict. Mr. Patterson did not raise the conflict of interest in response to the motion for summary judgment. This is, it wasn't presented at all. Is that right? In response to the motion for summary judgment, we got silence, Your Honor. Our motion for summary judgment was filed in early December after the motion to disqualify had been denied, the motion to dismiss for failure to join a necessary party, Chevron, had been denied, and the court had pointed a receiver. Those orders were issued in early November, late October, early November, and so the defendant's time to answer the complaint was November 16th. The defendant opted not to answer the complaint, and so in early December, CRBT moved for summary judgment. No responsive pleading was filed in connection with that motion, and in early January, January 11th, the district court denied the motion for default and instead opted to determine in its words whether CRBT as the moving party has met its burden of showing that summary judgment is appropriate. It found that that was the case and entered summary judgment. It's after that that appellants have filed their Rule 60 motion criticizing the district court and its determinations of the amounts that were due under the note. I see, but counsel, you do acknowledge that the disqualification was not resolved until after the receiver hearing was held and the receiver was appointed, right? That's correct, your honor. As a matter of fact, okay. So Bowers case, you've got to handle with care because Bowers, you know what it says. I won't tell you what it says. So tell me what you do with the Bowers case. I know it's Sixth Circuit. I know it's not mandatory authority, but tell me what you do with Bowers. Your honor, I have no problem with the Bowers decision, even though it's not from the Eighth Circuit. Because the facts in Bowers were that the defendant brought its motion to dismiss and that was converted into a motion for summary judgment. The court granted the motion to dismiss the gender discrimination claim and then declined to adjudicate the state law claims. It therefore dismissed the complaint on a summary judgment and then turned to the disqualification issue and said, I'm going to deny that motion as moot. That's very, very different from what happened in this case. First, the motion to disqualify was evaluated on the merits. It wasn't denied as moot, but it was considered and the district court found that there was not a disqualifying conflict. Second, the motion for summary judgment was considered after the motion to disqualify was denied. Now, your honor points to the fact that the motion for appointment of a receiver was determined first, but that's interim relief. It's not a dispositive motion. It's interim relief and the receiver was appointed. Well, it's dispositive as to who the receiver is. You agree with me on that, right? I would agree with you on that, but I think that that's using the word dispositive in a different context. Okay. Where do you get the... I know you use that throughout your brief as your theme. Where do you get that in law that dispositive matters on attorney-client conflicts? That the timing of the determination of a dispositive motion versus the timing of the motion. I believe that that's what Bowers says, is that Bowers looks at the fact that the motion for summary judgment rendered, which was a determinative motion on the merits, rendered the motion to disqualify moot. You get that from several other circuits. DC too has it, right? Saying the word dispositive motion. I'm not aware of the case that you're referring to standing at the podium here. Grimes, but it doesn't matter. That's just case you did that ring the bell with you. But the point is, is the record of the receiver hearing in the appellate record where we can get it or the district court or somewhere? A portion of the evidentiary hearing was transcribed and is in the record. The majority of that hearing is not. The portion of the hearing that's in the record was obtained by appellants and they sought only to obtain a portion of the hearing where Mr. Jones was testifying on direct examination. They chose not to obtain any other portions of the hearing. Well, is Jones's testimony enough to show that there's a conflict? Well, is Mr. Jones's testimony enough to show that there was a conflict? No. Okay, why? Well, Mr. Jones's testimony demonstrates that between the time that Winthrop and Weinstein represented MAKO, which ceased in May of 2012, was the last time that Winthrop and Weinstein represented MAKO. And then approximately a year later, we were asked to represent CRVT. And we obtained the conflict waiver letter at that time. And so it's not true that there was no conflict. The claim is that the conflict was waived. No. Why is that wrong? I mean, you've got exactly the same project. You have exactly the same party that you represented that you're about to sue. And you are dealing with facts that you have awareness of, both from following your representation and before your representation. And in any world where I have lived, worked, and I'll just tell you, I've spent over 30 years of my life on attorney standards committees and judiciary conduct committees, and I've drafted rules on conflict. And I've interpreted dozens and dozens of rules on conflicts. And I'm having a hard time with the idea that there is no conflict. Now, I get the idea that the conflict was waived, but that's a totally different animal. Now, you tell me why, if you've got knowledge and a party that you used to represent, and then you sue them, that that's not a conflict. Because I'm very curious in all ears. So under the hypothetical that you just said... Well, not under the hypothetical, under the facts of this case. This case, Dan, this case. So in this case, if there were no conflict waiver letter, is what you're asking? Yeah, because there's a conflict. It's just been waived. You know, what you're doing, I mean, I don't mean to play semantics with you, but the reality of it is that is there a conflict when you sue your old client arising out of a project that you represented them on, relating the facts that you became aware of, in part, at least, in your prior representation? Is that a conflict? Yes. Yes. And that's exactly the case here. Is it not? No. Why not? So the two engagements, the engagement that went through a pad for MACO, and the engagement that went through a pad for CRBT, are on different subjects. And the parties acknowledged that and agreed to that in the conflict waiver letter. They acknowledged that they're unrelated subjects. I think the court can look at that, and that's a determinative, that the parties determined that they were unrelated subjects. But let's dig a little deeper and talk about what the topics were. In connection with the work that Winthrop and Weinstein did for CRBT that was, first and foremost, the subject of that letter, the work that it did was it reviewed, analyzed, and assisted in drafting bond financing documents that permitted a $6 million financing facility to be provided to MACO and the other appellants. That work is distinct and different than providing work related to the tax credits that was done a year prior for MACO. Now, what happened is that given the fact that there is, what I would say is not a substantial relationship between the two matters, but there is at least some relationship. There's certainly a factual nexus. There is certainly a factual nexus. Given the fact that there was a factual nexus and given the fact that in March of 2013, it had only been 10 months since we had represented MACO, the firm went to MACO and said, we would like to obtain a conflict waiver letter so that we can do this prospective work. That's how Judge Strand analyzed this. He looked at and he said, well, what does that conflict waiver letter say? Exactly. And what if he's wrong? What happens then? What if he's wrong? Well, we think that if he's wrong, that the court should nevertheless affirm the entry of the order for judgment because the defendants defaulted and failed to respond to the motion for summary judgment. And so that's all a matter of a malpractice claim against the firm at that point, right? Because any lawyer would have raised the same theories, the same legal claims and defenses, and that therefore the results would have been the same. That there's nothing magical about your representation, and the result would have been the same. And so whatever else may exist, that's a claim as between your former client and your firm, right? Correct, and we think that the Inman versus American Home decision and the Acura decision both require that conclusion. So if the court gets to the point where it's saying Judge Strand was wrong on the disqualification, we're going to allow the motion for summary judgment to stand. There is a question then as to what the court does with Winthrop and Weinstein's continued involvement in the case. Because there is a foreclosure that's still scheduled. There are post-judgment things that need to take place. And we certainly would argue that the requested relief, that of dismissal of the case with prejudice, is inappropriate. It's inappropriate because they failed to participate. It's inappropriate because there's no case law that suggests that kind of conclusion. To the extent that this court ultimately decides that Judge Strand was wrong on the disqualification issue, we think that the appropriate ruling from this court, or ultimate ruling, would be to disqualify Winthrop from continued forward representation. That's not what they've sought, and there's nothing, and permitting the local council firm, the Richard Moeller and his firm, to continue because his firm had no involvement in that activity. And that gets into this concept that Appellant's counsel raised on argument, and his reliance on Dean Foods, and his reliance on the ABA code, and the canons of professional conduct, and this concept of a presumption of imputation of the conflict. Those rules were replaced in Iowa in 2005 by the ABA rules. And the subsequent case law takes a different tact and a different analysis. It does, and at the end of the day, it strikes me that applying that different analysis, that really timing still is everything in this case, right? As long as the judge makes a conclusion that you were not disqualified, and then they move forward with the case. It's a very different case than finding that here's my summary judgment, and I don't need to get to the disqualification. Because what the judge effectively found is, you were not disqualified, and then reached the merits of the case. And in the analysis of what do you do in that situation, you're arguing that that's a very different result. I think that's correct, Your Honor. And that bridges into the kind of standing comment that opposing counsel made at the end of his remarks. And we get this issue frequently in connection with foreclosure issues. The receivership order is very specifically constructed in connection with identifying the type of receiver that's appointed. And the type of receiver that's appointed in this case is a receiver over specific assets. It is not a receiver over the entity. And so it is possible to craft a receiver over an entity. And that's typically done in your corporate divorce-type proceedings. That wasn't done here. And so Mr. DeBolt, the president of these entities, or manager of these entities, still had authority to act on behalf of the entities. And their choice, their deliberate choice not to act in response to the motion for summary judgment, but to file a Rule 60 motion, to file a motion for a stay pending appeal, to do the other things that they've done, demonstrates that they had the ability to respond to the motion for summary judgment and made a deliberate choice not to. We ask the court to affirm. Thank you, counsel. Mr. Patterson? Let me say first that it is the same transaction. I ask Norman Jones on the stand, would you agree that Winthrop's representation in this foreclosure proceeding affects MACO 1? Answer, of course. And that would be the transaction. Capital T, not separate matters. Capital T, that's capital T in the letter. It's the same transaction. We don't have two separate transactions. It's not the bonds and then the bank. No, it's the same transaction. The bonds were pledged to the bank. It's the same transaction. You can't separate these two transactions because the confidential information flows through. They can't unknow what they know. And it harms my client. I guess one of the things that they seem to be arguing is that they're entitled to have this affirmed because we didn't defend. We didn't defend because all of our right, title, and interest in everything having to do with this foreclosure was conveyed to the receiver. I'm going to stand up in front of the judge and say, I represent, what do I represent? I have nobody to represent. All of these interests are in the receiver. But I have petitioned to intervene for why? Because, plus there's a practical matter. There's no money. There's no records. I did what I could do. I came here on an interlocutory appeal, which, probably correctly, this court dismissed. And then I had to wait until a final judgment, which then became appealable. And I appealed. There's nothing untoward about that. They come down to the Firestone case, which says, you know, you go forward and then you can decide the disqualification later. That was not a receivership. This is a receivership where my client was divested of the legal authority to participate. I mean, what was he to do? What was I to do? Who did I represent at that point? I followed the rules. I waited until there was a final decision, and then I came here on appeal. Timing is everything here. We should have decided the disqualification motion first, but Judge Strand didn't do that. We were forced to trial. At that point, the damage was done. Do we have defenses? Yes, we've got defenses. I allude to some of them in there. We think we've got a force majeure defense because it was the State of Iowa's failure to pay what they legally owed us that caused the note to go into default. But if I have no standing, I can't plead that. If I have no money, I can't prosecute the case. I can't even have postage. And I don't have any records because the receiver has all the records. The court has divested me of the ability to defend my client. And then I come in here and say, well, we were entitled to a judgment because you didn't defend him. Well, that's circular reasoning. That's the same circular reasoning that Judge Strand used when he looked at the letter. He said, oh, well, the letter says that my client can object that there's a conflict, but they've already waived it. I'm sorry. You can object, but you've already waived it. Nonsensical. Clearly the letter, the intent of the letter, the drafters of the letter, the signatories on the letter all agree. It said, if there's a conflict, Winthrop will withdraw. And that was Norm Jones' testimony. Actually, his e-mail when he was first asked about it. In April of 2017, he came back and the first thing he said was, well, the letter, if there's a conflict, the letter requires us to withdraw from representing both clients. Yes, that's right. That's what it says. And then, now, after the fact, they have constructed all of these other arguments about, oh, it's a different corpus. Oh, it didn't mean this or, oh, it meant that. You know, there's a real problem here. The problem is that they are not only the lawyer, they are the client. And they are standing here telling you what this letter means when their own partner, the drafter of it, admitted what it means. And you say you've given that to us, right? It's in here. It's quoted in here several times, yes. I think, Your Honor, that they're very close to bad faith. I ask you to reverse the judgment below and just remand this with instructions to disqualify Winthrop from representing one of its two clients. Thank you. Case number 18-1298 is submitted for decision by this court. That does conclude.